**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| LIFE PREMIUM FUND, SPC, | Case No.: 17-11899 |
| Debtor in a Foreign Proceeding | |

**DECLARATION OF ANDREW RICHARD**
**VICTOR MORRISON AS AUTHORIZED FOREIGN REPRESENTATIVE**
**IN SUPPORT OF THE PETITION FOR RECOGNITION OF THE CAYMAN**
**ISLANDS' LIQUIDATION PROCEEEDING AS THE FOREIGN MAIN PROCEEDING**

I, **ANDREW RICHARD VICTOR MORRISON,** hereby declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.      My colleague David Martin Griffin and I are the court-appointed joint official liquidators (the "Liquidators" or "Petitioners") and duly-authorized foreign representatives of the above-captioned debtor, Life Premium Fund, SPC (the "Debtor" or "Life Premium").

2.      Life Premium is in an official liquidation proceeding, Cause No. FSD 3 of 2015 (AJJ) (the "Cayman Proceeding"), pending before the Honorable Justice Andrew J. Jones QC of the Financial Services Division of the Grand Court of the Cayman Islands (the "Cayman Court") pursuant to an order entered on March 6, 2015 (the **"**Winding Up Order") under section 92 of the Cayman Islands Companies Law (2016 Revision) (the "Companies Law").

3.      I respectfully submit this declaration (the "Declaration") in support of the Liquidators' petition dated July 10, 2017 under chapter 15 (the "Chapter 15 Petition") of title 11 of the United States Code (the "Bankruptcy Code"), seeking the United States Bankruptcy Court's recognition of: (i) the Cayman Proceeding as a "foreign main proceeding"; and (ii) the Liquidators as the official "foreign representatives" of the foreign Debtor.

1

4.      I am a qualified insolvency practitioner and a senior managing director of FTI Consulting (Cayman) Limited ("FTI").  My colleague and fellow Liquidator Mr. Griffin is also a qualified insolvency practitioner at FTI.  We both meet the statutorily imposed requirements under the Cayman Islands Insolvency Practitioners' Regulations (2008 Revision) to act as liquidators.  We both work out of the offices of FTI, which are located at Suite 3212, 53 Market Street, Camana Bay, Grand Cayman, KY1-1203, Cayman Islands.

5.      I am duly authorized to make this Declaration on behalf of the Liquidators.  I am fully familiar with the facts of this matter as a consequence of my day to day conduct of the Cayman Proceeding.  Unless otherwise indicated, all statements contained herein are true to the best of my knowledge and based upon my personal knowledge of Life Premium's business, operations, and financial position.  I am over 18 and, if called to testify, would testify competently about the facts set out in this Declaration.

6.      I am familiar with the Model Law on Cross-Border Insolvency, adopted by the United Nations Commission on International Trade Law ("UNCITRAL"), and approved by a resolution of the United Nations General Assembly on December 15, 1997.  I understand that the Model Law has been adopted in the United States as chapter 15 of the Bankruptcy Code.

7.      For the reasons set out below, I submit that: (i) I am a duly appointed "foreign representative" of the Cayman Proceeding, and the Cayman Proceeding is a "foreign proceeding" within the meaning of sections 101(23) and (24) of the Bankruptcy Code, respectively; (ii) this case was properly commenced in accordance with the requirements of chapter 15 of the Bankruptcy Code; and (iii) the Cayman Proceeding satisfies all the requirements to be recognized as the "foreign main proceeding" under sections 1502(4) and 1517(b)(1) of the Bankruptcy Code.

## FACTUAL BACKGROUND

### A.    Summary

8.    Life Premium is a Cayman Islands-registered segregated portfolio company ("SPC") with four Portfolios: LS1, LS2, LS3, and LS4. Before the commencement of the Cayman Proceeding, LS2 and LS3 were purportedly consolidated and treated as one portfolio, designated LS2/3, although there is no evidence as to how the consolidation was effected.  Upon the appointment of the Liquidators, LS2/3 held interests in seventeen (17) Fractional Policies (defined below) and LS4 held eleven (11) Wholly Owned Policies (defined below).  LS4 had acquired two Wholly Owned Polices from Fiducia Capital Advisors LLC ("Fiducia"), a Delaware registered company jointly owned by LS1 and LS2/3.  The remaining nine (9) Wholly Owned Policies held by LS4 were originally acquired by LS1, but they were transferred to LS2/3 between August 2008 and January 2009 and then transferred from LS2/3 to LS4 in August 2014.

### B.    The Debtor's Corporate History and Portfolios

9.    On May 8, 2007, Life Premium was incorporated as a closed-ended exempted SPC under the laws of the Cayman Islands ("Cayman").  An "exempted" SPC is prohibited from undertaking business in Cayman, except in furtherance of its business carried on outside Cayman, under the Companies Law.  It may enter into contracts in Cayman and exercise all of its powers in Cayman, as necessary for it to carry on its business outside of Cayman.  So, for example, it can employ staff or agents in Cayman and have offices in Cayman in furtherance of its business outside of Cayman.  The segregated portfolios are held exclusively for the benefit of the owners of those segregated portfolios.

10.    Each portfolio's assets and liabilities must be entirely segregated from the assets and liabilities of the other portfolios and the general assets and liabilities of Life Premium under

3

the Companies Law.  Each portfolio was intended to have different trading and investment objectives and strategies for investment.

11.    Life Premium carried on business as an investment fund.  It was formed to procure and pool: (a) life settlement policies that insure the lives of elderly persons who were either terminally or chronically ill; and (b) rights to receive death benefits that would otherwise have been paid to the beneficiary of the insured or original owner, capitalizing on their maturity, or selling the assets before their maturity.  Life Premium initially established and operated three segregated portfolios: LS1, LS2, and LS3.  An additional portfolio, LS4, was established in or about August 2011.  According to the Confidential Master Private Placement Memorandum dated October 8, 2007 ("PPM") and the supplements to the PPM, each portfolio established by Life Premium was intended to have different trading and investment objectives and strategies as well as different economic terms.  Investors were offered non-voting participating shares in each of the portfolios.  According to the PPM supplements, the projected duration of the investment program for each portfolio was as follows:

   a)  LS1 was six years from December 15, 2007 to December 15, 2013;

   b)  LS2 and LS3 were six years from March 31, 2008 to March 31, 2014; and

   c)  LS4 was six years from August 17, 2011 to August 17, 2017.

12.    Before the appointment of the Liquidators, the directors of Life Premium were Messrs. Ray Cifre, Fernando Guerrero, Robert Carreto, and William Scott Page.  Based on the limited and conflicting information available to the Liquidators, they understand that Mr. Carreto and Mr. Page resigned as directors prior to July 2011.  Life Premium Fund Advisors, Ltd ("LPA"), a Cayman Islands exempted company, was appointed as investment manager, pursuant to a Management Agreement dated September 12, 2007.  The Liquidators understand that Mr.

Cifre and Mr. Guerrero controlled the management and operations of LPA. Upon information and belief, the Liquidators understand that Mr. Cifre has resided in both Puerto Rico and New York and Mr. Guerrero resides in Mexico City. Mr. Page is the President and CEO of The Lifeline Program ("Lifeline"). Lifeline is located at 1979 Lakeside Parkway, Suite 200, Tucker, Georgia 30084. It acted as a policy provider to Life Premium, and all Wholly Owned Policies and Fractional Policies (defined below) were acquired through Lifeline. Lifeline was also responsible for obtaining independent medical reviews for those policies. Lifeline also provided certain services to Life Premium, including:

a) Monitoring death registers to track the maturity of policies; and

b) Arranging the payment of premiums for Wholly Owned Policies, which had to be paid by check in the United States.

13.    Based upon information obtained by the Liquidators, it appears that LS1 originally held 100% interests in life insurance policies (the "Wholly Owned Policies") and LS2 and LS3 held fractional interests of between 1% and 94% in life insurance policies (the "Fractional Policies"). The key distinction between LS2 and LS3 was that investors in LS2 paid cash for their shares at the rate of US$1,000 per share, whereas investors in LS3 were issued shares in exchange for the value of Fractional Policies migrated by those investors into LS3.

14.    At some point before or during 2008, LS2 and LS3 were combined into a new consolidated portfolio called LS2/3.[1] Further, the Wholly Owned Policies originally held by LS1 were transferred to LS2/3, pursuant to certain Whole Policy Purchase Agreements entered into in 2008 and 2009.

---

[1] It appears that the LS2 and LS3 investors were not notified of the consolidation. *(Note: This consolidated portfolio is referred to in several documents as "LS2/3," "LS23," and "LSC23." All forms are correct and should be understood as interchangeable.)*

15.     The overall effect of these transfers meant that, on the date the liquidation of Life Premium was commenced, and as determined by the Liquidators' investigations:

   a)   LS1 no longer held any Wholly Owned Policies and its only assets comprised of cash of US$788, the receivables due and owing by LS2/3 and LS4 in the sums of US$2,170,716 and US$660,963, respectively, and its investment in Fiducia.

   b)   LS2/3 held cash of US$50,918, seventeen Fractional Policies (not included in the above transfers from LS1) with a total face value of US$7,461,779, a receivable from LS4 in the sum of US$3,946,420 and its investment in Fiducia and owed the sum of US$2,170,716 to LS1; and

   c)   LS4 held cash of US$7,209, eleven Wholly Owned Policies originally held by LS1 and Fiducia with a face value of US$5,659,900 and owed US$3,946,420 to LS2/3, US$660,993 to LS1, and US$950,015 to Fiducia.

**C.   Events Leading Up To The Cayman Proceeding**

16.     On January 6, 2015, a petition (the "Winding Up Petition") was presented by Bernardo Emilio Martin (the "Petitioning Investor") to wind up Life Premium on three grounds: (a) Life Premium was insolvent; (b) it was just and equitable that Life Premium be wound up; and (c) the period of six years fixed by Life Premium's PPM had expired under section 92 of the Companies Law.  Mr. Martin resides in Rio Negro, Argentina.

17.     The Petitioning Investor holds 256.2 non-voting participating shares in LS2 and 199.15 non-voting participating shares in LS3, which he acquired on November 20, 2008 and November 28, 2008, respectively.

18.     As required by the Companies Law and the Companies Winding Up Rules 2008 (as amended) ("CWR") (together "Cayman Law"), the investors of the Debtor's four portfolios were given notice of the filing of the Winding Up Petition and the request for the appointment of

6

the Liquidators in the *Cayman Compass* newspaper on February 9, 2015 and the *Ambito Financiaro* newspaper in Argentina on February 10, 2015 (as that is where the majority of the investors are located). The Cayman Court also ordered that Advanced Fund Administration AFA (Cayman) Limited ("AFA"), Life Premium's administrator, serve copies of the Winding Up Petition and affidavits filed in support on each investor of Life Premium by electronic mail or, in the absence of electronic mail addresses, by mail. AFA carried out service on all investors on February 5, 2015.

19.     The Petitioning Investor's complaints made in the Winding Up Petition can be summarized as follows:

a) Since April 10, 2010, there was no independent oversight of the investment manager because Life Premium's directors were the sole controllers of both Life Premium and the investment manager.

b) In breach of Life Premium's articles of association (the "Articles") and the Confidential Master Private Placement Memorandum dated October 8, 2007 (the "PPM"), no annual audited financial statements had ever been provided.

c) As of December 31, 2009, Life Premium stated it held 52 policies, whereas as of February 28, 2014, it stated it held 26 policies. The apparent loss of the policies had never been explained.

d) In breach of the duty imposed by section 219(6) of the Companies Law, Life Premium's directors failed to keep the assets of LS2 and LS3 segregated. In breach of their obligations under the Companies Law, the directors caused assets and liabilities of the portfolios to be comingled, and purported loan transactions and receivables were created between the portfolios.

e) Life Premium failed to comply with the investment criteria set forth in the PPM.

f) As required by the Articles and the PPM, Life Premium's directors failed to take any meaningful steps to preserve the assets of Life Premium. Specifically, the directors did not act in the best interests of Life Premium when they failed to: (i) question and/or verify the accuracy and authenticity of life expectancy certificates for insured persons; or (b) obtain new life expectancy certificates for insured persons.

g) By failing to keep investors informed of the imminent lapse of policies or requesting funding from them to pay premiums, Life Premium's directors permitted, or took insufficient steps to prevent, Life Premium's assets to be wasted and therefore failed to act in the company's best interests.

20.     The Winding Up Petition was supported by one investor of LS1, 29 investors of LS2, and 79 investors of LS3.

21.     On March 5, 2015, Appleby, attorneys for Life Premium, confirmed that it would not oppose the Winding Up Petition.

22.     Under the circumstances, an order was entered by the Cayman Court dated March 6, 2015, placing Life Premium into official liquidation and appointing the Liquidators (the "Winding Up Order").

**D.     Current Status of the Cayman Proceeding**

23.     Before the appointment of the Liquidators on March 6, 2015, the registered office of Life Premium was maintained at the offices of Appleby Trust (Cayman) Ltd. ("Appleby Trust"), Clifton House, 75 Fort Street, P.O. Box 1350 GT, George Town, Grand Cayman, KY1-1104, Cayman Islands.

24.     After Life Premium was placed into official liquidation to be wound up in accordance with the Companies Law, Life Premium's registered office was changed to FTI's offices, 2D Landmark Square, 64 Earth Close, P.O. Box 30613 SMB, Grand Cayman KY1-1203, Cayman Islands.  On October 1, 2015, FTI moved its offices, and so the Debtor's registered address was changed to Suite 3212, 53 Market Street, Camana Bay, P.O. Box 30613, Grand Cayman, KY1-1203, Cayman Islands.

25.     Since being appointed as the Liquidators twenty eight months ago, Mr. Griffin and I have undertaken the following work:

a)  Undertaking initial investigations and identifying and securing the Debtor's policies and assets;

b)  Identifying potential buyers for the life settlement policies and marketing them for sale;

c)  Negotiating with potential buyers and agreeing a transaction to dispose of the Wholly Owned Policies;

d)  Administering and maintaining the life settlement policies, including the sourcing of loans to fund premium payments in relation to both Wholly Owned and Fractional Policies;

e)  Seeking to obtain detailed investigations of books and records and consideration of potential legal claims arising from those investigations;

f)  Seeking legal advice in relation to the validity of inter-portfolio transactions and conducting an accounting restatement exercise that was required on the basis of that advice;

g)  Establishing liquidation committees of investors and creditors for the portfolios;

9

h)  Preparing statutory reports to and holding meetings of investors, creditors and the liquidation committees;

i)  Engaging in regular correspondence with investors, creditors and liquidation committee members, including the setup and administration of a website for the purpose of communicating with investors; and

j)  Preparing and filing various applications to the Cayman Court for directions in relation to the management of the liquidation estate and the sanction of certain actions by the Liquidators.

### *Initial Steps and Identifying and Securing the Debtor's Policies and Assets.*

26.     After our appointment as Liquidators, we were required to comply with certain statutory requirements under the CWR.  This included the publication of certain statutory notices and the convening of a first meeting of investors.   On April 29, 2015, the first meeting of investors was held in Buenos Aires.  The main purpose of the meeting was to elect a committee of investors (the "Committee").  The Committee was formally constituted on May 7, 2015.

27.     The Liquidators consulted with the Committee during the period of May 7, 2015, to August 21, 2015, when an order was made by the Cayman Court directing that the Committee be discharged and reconstituted as the liquidation committee of the LS3 portfolio.  The order also required the Liquidators to seek to establish committees for LS1, LS2, and LS4 (the "Committees").  This was to ensure that all investors and/or creditors were properly represented as appropriate, while recognizing the different interests of the investors and creditors in each of the Debtor's portfolios.

28.     Under Cayman Law, a liquidator is required to consult with the members of a liquidation committee regarding the progress of the liquidation on a regular basis and to canvass

their views on any major decisions that may be made concerning the conduct of the liquidation. While we are not obligated to act in accordance with the views of investors, their views will usually be persuasive, and the Cayman Court will want to know what those views are before making any decisions concerning the liquidation. A liquidation committee is responsible for considering and agreeing to the fees of a liquidator before the Cayman Court approves them.

29.     A total of six formal meetings of the various liquidation committees have taken place in the liquidation proceedings to date. I would note that there are certain statutory requirements under the CWR for the formation of a liquidation committee to be valid. It has not been possible to maintain compliant liquidation committees and therefore the last remaining Committee of Life Premium was disbanded on December 16, 2016.

30.     In addition to consulting with the Committees established for the Debtor's portfolios, the Liquidators have issued regular correspondence to all investors regarding the liquidation, which has been provided in both English and Spanish because the majority of the investors are located in Argentina and Mexico. The Liquidators have also set up a liquidation website (http://www.lpfliquidation.com/) for the purposes of maintaining communications with investors.

31.     Since the appointment, the Liquidators have attempted to collect and obtain complete books and records from Life Premium's directors, investment manager, and other service providers. While some information has been provided, it has been challenging to obtain a complete set of the Debtor's books and records.

32.     The Liquidators took control of the life settlement policies after their appointment. As stated above, these Wholly Owned Policies were originally held by LS1 but were transferred to LS2/3 in 2008 and 2009, before being transferred to LS4 in August 2011.

Further, the Liquidators discovered that LS4 was not the registered owner and beneficiary of the two largest Wholly Owned Policies and that they were registered in the name of Fiducia, a company incorporated under the laws of the State of Delaware and owned by LS1 and LS2/3.  The Liquidators took immediate steps to secure the assignment of the two policies to Life Premium.

33.    The Liquidators discovered that ten Fractional Policies with a cash value of US$478,796 were held by an escrow agent, and therefore, no funding would be required to fund premiums for those policies until the cash value had been exhausted. There was no ability for the Liquidators to realize that cash, so the cash values have been treated as "premium reserves." That meant that the premiums for some policies would not need to be funded by Life Premium for several years.  In other cases, the reserves were insufficient to meet upcoming premiums.

### Short Term Funding, Financing, and Sale of Policies

34.    The Liquidators undertook a detailed analysis of the bank statements that they received from FirstCaribbean and JP Morgan Chase for the period of November 1, 2013, to February 27, 2015, to understand how maturity receipts from policies and other funds had been utilized. That analysis has subsequently been utilized by the Liquidators to consider potential claims against certain third parties who received monies from Life Premium.

35.    As of March 6, 2015, the portfolios held cash balances with FirstCaribbean totaling US$58,915.  The Liquidators needed to secure further funding to meet premium payments to avoid policies lapsing and a loss of value in the assets held by the portfolios.  On March 18, 2015, the Liquidators wrote to investors and eight third party commercial lenders to seek funding offers.

36.    None of the investors put forward offers of funding but the Liquidators did receive funding proposals from two of the commercial lenders.  The Liquidators considered both offers and determined that one of them was acceptable.  A loan facility of US$200,000 was subsequently negotiated and entered into by the Liquidators.  The loan was used to service premium payments and therefore maintain the Wholly Owned Policies held by LS4, pending a marketing process by the Liquidators in order to dispose of them.

37.    The Liquidators found that we had sufficient funds to continue to pay the premiums of the Wholly Owned Policies until the middle of November 2015, which would allow a sale process for those policies to be completed before they were at risk of lapsing.  We contacted potential purchasers to explore if they were interested in purchasing any of the policies.  Twenty potential purchasers expressed an interest and were provided with a letter outlining the marketing and sales process as well as a draft sale agreement.  We received four initial offers for the Wholly Owned Policies of between US$837,500 and US$1,581,961.  In October 2015, we successfully negotiated a sale for eleven Wholly Owned Policies in the sum of US$1,651,961.

38.    The Liquidators also found that LS3 had sufficient premium reserves to service Fractional Policies until October 2015, which they believed would allow the sale process to be completed before the policies became at risk of lapsing.  However, despite an extensive marketing process and some limited interest, we were unable to sell the Fractional Policies.  As a result, we had to make difficult decisions about how to spend Life Premium's limited cash resources on premiums for those policies.  We obtained orders from the Cayman Court allowing us to let ten Fractional Polices lapse due to insufficient funding.

### *Investigating Potential Claims*

39.     Among other things, we have investigated the alleged transfers of the Wholly Owned Policies. *See supra* ¶¶ 14-15. We have also conducted investigations concerning the Debtor's affairs to determine if there are any potential claims against third parties which may give rise to further recoveries for the benefit of the Debtor's creditors and investors.

### *Pooling Order*

40.     On the basis of two legal opinions provided to the Liquidators, we sought orders for (i) the pooling of the Company's assets for the purpose of paying its costs and expenses and distributions to stakeholders, and (ii) permitting the Liquidators to rank the LS4 portfolio investor's claims as ordinary creditors. These orders were granted by the Cayman Court on December 16, 2016.

## CHAPTER 15 PETITION AND BASES FOR RECOGNITION
## OF THE CAYMAN PROCEEDING AND RELIEF REQUESTED

41.     This case was commenced by Kobre & Kim LLP, at the Liquidators' direction, by filing the Chapter 15 Petition with this Court. For the reasons set forth below, I believe that (i) the Cayman Proceeding should be recognized by this Court as a foreign main proceeding; and (ii) Mr. Griffin and I, in our capacity as the court-appointed joint official liquidators responsible for asset recovery internationally and duly-authorized foreign representatives of the Cayman Proceeding and the Debtor, as applicable, are entitled to the rights and protections incident to such recognition as well as to the additional relief requested in the Chapter 15 Petition under chapter 15 of the Bankruptcy Code.

A.    **The Debtor's Known Assets Are Dispersed in the United States, Thus the Liquidators Selected this District Where Assets Are Located as a Matter of Efficiency and Convenience**

42.    I have been informed by Kobre & Kim that Life Premium – as the entity subject to the Cayman Proceeding – is eligible to be a chapter 15 "debtor" as that term is defined in section 1502(1) of the Bankruptcy Code.  I have also been informed by Kobre & Kim that courts in certain districts in the United States have also required chapter 15 debtors to comply with the eligibility requirements set forth in section 109(a) of the Bankruptcy Code, namely that a debtor have assets or business operations in the United States to be a debtor.

43.    I believe this requirement, to the extent applicable, is satisfied.  Specifically, Life Premium has eight Fractional Policies which have a face value of $1,721,401 and, based on life expectancy projections and the funding that is available to meet the policy premium payments that are anticipated to fall due, an estimated realizable value in the liquidation of at least US$235,174.  Those Fractional Policies are all with insurers based in the United States and administered with the assistance of Lifeline, which is registered in Georgia, and Kaufman Rossin, P.A. ("Kaufman Rossin"), which is registered in Florida.  I understand that the premium reserves of US$478,796 referred to in paragraph 33 above are held by Kaufman Rossin as escrow agent, subject to the deductions of premiums paid since our appointment as Liquidators (I have requested that Kaufman Rossin quantify those deductions but they have yet to provide me with that information).  Additionally, the Liquidators anticipate that through recognition of the Cayman Proceeding and the exercise of discovery powers requested in the Chapter 15 Petition, they will be able to identify claims belonging to the Debtor located in the territorial jurisdiction of the United States.  Moreover, the Liquidators have deposited funds of the Debtor into a client trust account with its counsel, Kobre & Kim in New York.

44.     Furthermore, the Liquidators have been advised by Kobre & Kim that the proper venue for Chapter 15 cases is determined by section 1410 of title 28 of the United States Code, which provides that a Chapter 15 case should be commenced in the United States Bankruptcy Court for the district: (1) in which the debtor has its principal place of business or principal assets in the United States, (2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a United States Federal or State court, or (3) if neither (1) or (2) apply, in which venue will be consistent with the interests of justice and the convenience of the parties.

45.     Here, the Debtor has several business ties, discovery targets, and potential assets residing within this district.  First, the Debtor's former Investment Manager conducted business within this district.  Further, and although currently inactive since the commencement of the liquidation, the Investment Manager may be in possession of key information and thus is subject to potential discovery.  Second, upon information and belief, Mr. Cifre, one of the Debtor's key former directors, has resided in New York.  Third, the Debtor had bank accounts at JP Morgan Chase, New York branch, and because the bank retains in its possession relevant documents that are needed by the Petitioners to complete its investigation, it is subject to discovery as well. Fourth, before commencement of the Cayman Proceeding, the Debtor retained a law firm based in New York and paid fees in excess of $145,000.00.  Further, the Debtor has deposited funds into a client trust account of Kobre & Kim located at Citibank, N.A. in New York County and thus within this district.  Given the Debtor's business ties to New York, the Foreign Representatives, on behalf of the Debtor, intend to take steps to investigate and, if appropriate, to pursue claims and causes of action which claims and any recovery obtained would constitute additional property of the Debtor's located within this district.  All of the other Debtor's known

16

assets are widely dispersed throughout the United States in no one single jurisdiction. The Debtor is not a party to litigation in another district in the United States.

46.     For these reasons, I believe that it would be proper for these proceedings to be conducted in this district.

**B.      The Cayman Proceeding Is a Foreign Main Proceeding**

47.     The Liquidators have been advised by Kobre & Kim that the Bankruptcy Code defines (i) a "foreign proceeding" as a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, pending in a foreign country, under the supervision of a foreign court and for the purpose of reorganizing or liquidating the assets and affairs of the debtor, and (ii) a "foreign court" as a judicial authority competent to control or supervise a foreign proceeding.

48.     I believe the Cayman Proceeding fits squarely within the Bankruptcy Code's definition of a "foreign proceeding," as by definition it is a liquidation proceeding pursuant to and governed by the Companies Law under the collective judicial supervision of the Cayman Court for the benefit of the Debtor's creditors, investors, and other parties in interest.

49.     I have also been advised by Kobre & Kim that, in order to be entitled to recognition as a "foreign main proceeding" under chapter 15 of the Bankruptcy Code, it must be shown that the foreign proceeding is pending in the jurisdiction where the debtor has its center of main interests ("COMI").

50.     I believe the Cayman Proceeding qualifies as a "foreign main proceeding" because Life Premium was formed under the laws of the Cayman Islands and maintains its registered office here. I believe that there is no basis for rebutting this statutory presumption that is afforded, and that, in any case, the facts clearly indicate that Life Premium's COMI is the Cayman Islands. As demonstrated by the facts set out in paragraphs 8 to 15 and 34 to 40 above,

I believe that Life Premium was engaged in non-transient economic activity in the Cayman Islands.

51.    Moreover, the Cayman Proceeding has been pending before the Cayman Court for over two years now.  During which time, the Liquidators have collected a considerable amount of the books, records, and financial documents.  Critical documentation has been transferred to the Cayman Islands, and the Liquidators have marketed and sold the Wholly Owned Policies and have investigated the Life Premium and its business operations.  The remaining policies held by Life Premium are Fractional Policies, and any management decisions concerning these policies are made exclusively by the Liquidators in the Cayman Islands.

52.    Further, the Liquidators took steps to investigate and, if appropriate, to pursue claims and causes of action against the aforementioned parties or others, which claims and any recovery obtained would constitute additional property of the Debtor to be potentially distributed to creditors and investors in the Cayman Proceeding.  To the best of the Liquidators' knowledge, no action in respect of Life Premium, whether transactional or litigation related has been commenced without the Liquidators express approval and consent.  The Liquidators are not aware of the existence of any insolvency proceeding concerning Life Premium other than the Cayman Proceeding, nor are they aware of any suggestion having been made at any time during its pendency by a creditor or party in interest that Life Premium's center of main interest is anywhere other than Cayman.

53.    Based upon the committee meetings of investors, which took place over the past two years, the support of investors for the winding up of the Debtor by the Cayman Court, the proving of claims by some of the creditors of Life Premium in the Cayman Proceeding, and the possible payment of dividends by the Liquidators to creditors and investors pending asset

recovery, I believe all relevant creditors and investors regard Life Premium to be a Cayman Islands company and the Liquidators to be Life Premium's current "nerve center".

54.      As Liquidators, we have displaced the board of directors of Life Premium and the company has been in liquidation before the Cayman Court over the last two years.  All creditors and investors may submit their claims in the Cayman Proceeding, and all claimants have the right to access the Cayman Court and appeal decisions of the Liquidators, if necessary. Moreover, the liquidation of Life Premium and its remaining affairs are being conducted in the Cayman Islands.

55.      Substantially all the work to date relating to the Cayman Proceeding has been conducted in the Cayman Islands by the Liquidators and FTI's staff, and all work has been and will continue to be supervised by me and my fellow Liquidator Mr. Griffin, and ultimately, is subject to the supervision and orders of the Cayman Court.

**C.      The Liquidators Are the "Foreign Representatives" of the Cayman Proceeding**

56.      I am informed by Kobre & Kim that a chapter 15 petition must be filed by a "foreign representative" which the Bankruptcy Code defines as a person or body authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

57.      I believe that I am a proper "foreign representative" for the following reasons:  I am an individual who has been duly appointed by the Cayman Court to act as the Liquidator of the Cayman Proceeding.[2]  In such capacity, my role has included the collection and liquidation of the Debtor's assets under the continued supervision of the Cayman Court.  Moreover, by the Chapter 15 Authorization Order, the Cayman Court explicitly authorized me to commence an

---

[2] As set forth below, a copy of the Winding Up Order is attached as Exhibit A hereto.

ancillary case in the District seeking Chapter 15 recognition of the Cayman Proceeding.

**D.    This Declaration Contains the Disclosures Required for Granting Recognition of the Cayman Proceeding**

   **1.    Copy of the Decision Commencing Cayman Proceeding and Appointing Me as the Official Foreign Representative**

58.    I am informed by Kobre & Kim that section 1515(b) of the Bankruptcy Code requires that a petition for recognition of a foreign proceeding be accompanied by a certified copy of the decision commencing such proceeding and appointing the foreign representative.

59.    As noted above, the Cayman Court entered the Winding Up Order, granting the Winding Up Petition and appointing Mr. Griffin and me as the Liquidators.  A copy of the Winding Up Order is attached hereto as **Exhibit A**.  As also noted above, by the Chapter 15 Authorization Order, the Cayman Court explicitly authorized the Liquidators to seek Chapter 15 recognition of the Cayman Proceeding in the United States.   A copy of the Chapter 15 Authorization Order is attached hereto as **Exhibit B**.

   **2.    Statement concerning all Known Foreign Proceedings regarding the Debtor**

60.    I am informed by Kobre & Kim that section 1515(c) of the Bankruptcy Code requires that a petition for recognition of a foreign proceeding contain a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.  I hereby state that, to the best of my knowledge and belief, the Cayman Proceeding is the only foreign proceeding currently pending with respect to the Debtor.

**E.    Facts and Circumstances Warranting Discretionary Relief under Chapter 15 of Bankruptcy Code**

61.    After consultation with Kobre & Kim, in addition to the relief that will arise automatically upon recognition of the Cayman Proceeding as a foreign main proceeding, I have decided to request certain additional discretionary relief available under chapter 15 of the

20

Bankruptcy Code.  For the following reasons, I believe such relief is warranted and appropriate under the circumstances:

### 1.    Relief Protecting the Debtor and the Debtor's Assets

62.    By the Chapter 15 Petition, and to ensure that the Debtor and its assets are fully protected, I have requested that the Court enjoin and enter a stay against any parties that may attempt to commence any actions or claims in the United States against the Debtor or its property, or otherwise attempt to transfer, encumber, or dispose of such property under sections 1521(a)(1), (2), and (3) of the Bankruptcy Code.

63.    If any creditors take actions in the United States against the Debtor or its property seeking to obtain more than the distribution they are entitled to under <u>Cayman Law</u> – especially property which the Petitioners have yet to identify as belonging to the Debtor and recoverable for distribution to the Debtor's creditors and investors – the financial burden of such an action could be severe.  If such creditors can effectively evade the Cayman Proceeding by commencing actions in the United States, I, on behalf of the Debtor, would be left to defend against these suits, regardless of their merit.  This could irreparably deplete the limited resources available to me to collect and administer the Debtor's assets and the resulting distributions to creditors and investors in the Cayman Proceeding.

64.    For these, among other, reasons,[3] I believe granting this additional relief will protect the interests of all of the Debtor's creditors and investors in having claims against the Debtor valued and paid on a consistent, non-discriminatory basis, as determined by the Cayman Court.

---

[3] I reserve the right to set forth more fully the bases for this relief at the request of the Court or in the event such relief is objected to by a party in interest.

### 2.    Relief Authorizing Discovery

65.    By the Chapter 15 Petition, I also have requested authorization from the Court to examine witnesses and take evidence and information concerning the Debtor's assets, affairs, rights, obligations or liabilities under section 1521(a)(4) of the Bankruptcy Code.  I have reason to believe that a substantial amount of property belonging to the Debtor was improperly transferred away in the lead-up to the commencement of the Cayman Proceeding.  In accordance with my duties as the Liquidator, I am investigating these transfers in an attempt to find additional assets that should be collected and distributed to the Debtor's creditors and investors in the Cayman Proceeding.  That investigation has expanded beyond the borders of the Cayman Islands and led me to believe that such assets exist within the United States.  In fact, obtaining the discovery powers set forth in section 1521(a)(4) is central to the purpose for which the Cayman Court directed me to commence a chapter 15 case.  As noted above, the Debtor is not currently party to any litigation in the United States and, therefore, without authorization from this Court, upon recognition, I will not have immediate means to otherwise obtain discovery or compel disclosures from third parties.  Accordingly, I believe the requested discovery powers are essential to my ability to fulfill my duties under Cayman Law and my mandate from the Cayman Court.

### 3.    Relief Entrusting Administration, Realization, and Distribution of the Debtor's Assets to the Foreign Representatives

66.    By the Chapter 15 Petition, I also have requested that the Court entrust me with the administration, realization, and distribution of all of the Debtor's assets within the territorial jurisdiction of the United States under sections 1521(a)(5) and 1521(b) of the Bankruptcy Code. Similar to what I understand from discussions with Kobre & Kim to be the duties of a Chapter 7 trustee under section 704 of the Bankruptcy Code, I (in my capacity as the Liquidator of the

Cayman Proceeding) am charged with liquidating the Debtor's assets and distributing the proceeds thereof in accordance with Cayman Law and under the supervision of the Cayman Court. Indeed, I consider fulfilling these duties with respect to assets identified and collected in the territorial United States to be germane to my appointment as the Liquidator and Foreign Representative of the Cayman Proceeding. Among other benefits, such relief would avoid the administrative cost and delay attendant to requesting similar relief in a piece-meal fashion for every asset subject to the Cayman Proceeding that I identify as being located within the United States. I will comply with any notice or reporting requirements that the Court may deem necessary or appropriate.

**4.    Relief Will Sufficiently Protect the Interests of Creditors**

67.    I am informed by Kobre & Kim that, before granting additional relief under section 1521 of the Bankruptcy Code, the Court must be satisfied that the interests of creditors and other interested entities, including the debtor, are sufficiently protected. I believe the additional relief requested in the Chapter 15 Petition satisfies this requirement because, among other reasons, the Debtor's creditors are "sufficiently protected" by the treatment afforded to them in the Cayman Proceeding under Cayman Law. In particular, claimants in the United States (if any) are not being subjected to undue inconvenience or prejudice because, for example, Cayman Law does not create any additional burdens for foreign creditors to file a claim and confers upon them the same status and rights as creditors in the Cayman Islands. Moreover, substantially in accordance with what I understand, through discussions with Kobre & Kim, to be the distribution scheme under the chapter 7 of the Bankruptcy Code, the distribution scheme in liquidation prescribed under Cayman Law grants priority to certain administrative claims and grants secured claims priority over unsecured claims. Accordingly, the ultimate distributions

creditors will receive on account of their claims in the Cayman Proceeding will be materially

consistent with those they would have received under law in the United States.

> ### 5. Relief Is Consistent with the Purposes of Chapter 15 and the Court's Mandate to Cooperate with the Foreign Court and Foreign Representative to the Maximum Extent Possible

68.    I am informed by Kobre & Kim that discretionary relief under chapter 15 of the

Bankruptcy Code should be consistent with the statutory purposes of chapter 15 and further

international cooperation between United States' and foreign courts. I believe granting the relief

requested by the Chapter 15 Petition is consistent with these goals. By recognizing the Cayman

Proceeding as a "foreign main proceeding" and enjoining creditors from commencing or

continuing actions against the Debtor or its assets in the United States, the Court would be

fostering cooperation between courts in the Cayman Islands and the United States and ensuring

that the fair and efficient administration of the Debtor's assets in the Cayman Proceeding cannot

be disrupted by creditors or other parties in interest outside of the Cayman Islands. Moreover, by

empowering me to employ the means of investigation and discovery available under United

States law and procedure, this Court would be protecting and maximizing the value of any assets

located in the United States that belong to and was absconded from the Debtor, and promoting

legal certainty by ensuring those assets are collected and administered by me in accordance with

Cayman Law.

## F.    Cayman Proceeding and Cayman Law Provide Creditors and Other Parties in Interest with Due Process

69.    I am informed by Kobre & Kim that the Court may deny any of the relief

requested by the Chapter 15 Petition if it determines that granting such relief would be

manifestly contrary to the public policy of the United States. I am also informed by Kobre &

Kim that this analysis, in part, turns on whether creditors and other parties in interest are

provided rights in the foreign proceeding that comport with notions of due process under United States law.

70.     To assist in this analysis, I wish to inform the Court that under Cayman Law, the Cayman Proceeding has provided (and continues to provide) creditors and other parties in interest with the notice and opportunities to participate and be heard, which are consistent with concepts of due process under United States law and jurisprudence, as I understand them.   In sum, the relief I have requested under the Chapter 15 Petition would effectively extend this liquidation process into the United States, ensuring that assets belonging to or transferred from the Debtor located within the territorial jurisdiction of the United States do not escape the reach of the Cayman Proceeding.   The relief requested under the Chapter 15 Petition would also empower me to employ the necessary means of investigation and discovery that are afforded as of right to trustees in plenary bankruptcy cases under the Bankruptcy Code.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.


Dated:    July 10, 2017
Grand Cayman, Cayman Islands

/s/ Andrew Richard Victor Morrison
**ANDREW RICHARD VICTOR
MORRISON**

Joint Official Liquidator of Life Premium
Fund, SPC (in official liquidation)